Ann Marie SHERIFF, a minor by Marsha A. Bishoff, her Parent and Natural Guardian, Plaintiff,

v.

Jo Anne BARNHART, Commissioner of Social Security, Defendant.

No. CIV.A. 01–383.

United States District Court, W.D. Pennsylvania.

Dec. 6, 2002.

Stanley E. Hilton, Monroeville, PA, for plaintiff.

Marshall J. Piccinini, U.S. Attorney's Office, Erie, PA, for defendant.

### MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Plaintiff Ann Marie Sheriff ("Sheriff") through her mother, Marsha A. Bishoff ("Bishoff"), commenced the instant action seeking judicial review of a final decision by Defendant Jo Anne B. Barnhart, Commissioner of Social Security, denying her application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. This Court has jurisdiction over the instant matter pursuant to 42 U.S.C. § 1383(c)(3), which incorporates the provisions of 42 U.S.C. § 405(g). For the reasons set forth below, we will affirm the decision of the Commissioner.

### I. BACKGROUND

Plaintiff alleges disability as of April 26, 2000 due to Borderline Intelligence, Psychotic Disorder, NOS, Bipolar II Disorder and Attention Deficit Hyperactivity Disorder. (R. 80.) She filed an application for benefits protectively (R. 80, 83), which was denied at both the initial review and reconsideration levels. (R. 69–72.) On March 26, 2001, having held a hearing at which both Sheriff and Bishoff were represented by counsel and testified, an Administrative Law Judge ("ALJ") denied Sheriff's claim, finding that she did not meet the statutory definition of a "disabled" individual. (R. 14–28, 35–65.) The Appeals Council denied further review of the claim (R. 5–6), and the ALJ's decision thereby became the final decision of the Commissioner. The case is now ripe for review, both parties having filed motions for summary judgment.

#### A. School Records

Sheriff was born October 2, 1991 and was nine years-old and in the third grade at the time of the ALJ's decision. (R. 27, 80.) School records reveal that Sheriff attends a regular school, but takes special education classes in language arts and

speech. She is mainstreamed in all other courses. (R. 114, 209–10.) She has never been demoted or held back in school. (R. 211.) Her teachers have consistently reported that she is pleasant, polite, respectful, and able to play well with her peers. (R. 115, 128, 131, 136, 143, 162, 168, 210–12.)

Sheriff's need for learning support was formally identified in early 2000 when she was in the second grade. Her difficulties, particularly in the area of reading and writing, were demonstrated in her performances on a CELF–R Screening Test (R. 133) and the Iowa Tests of Basic Skills (R, 145), both of which were administered in February of 2000. With respect to the former, Sheriff tested one year, eight months below her chronological age on the Expressive One–Word Picture Vocabulary Test. (R. 133.) The Test for Examining Expressive Morphology showed significant delays in the area of sentence structure, particularly with regard to plurals, possessives, subject-verb agreement and verb tensing. (*Id.*) Sheriff's core total score of 6 on the Iowa Tests of Basic Skills, which was felt to best describe her overall achievement, was interpreted to mean that she had scored better than just 6 percent of all second-grade students nationally. (R. 145.) Her reading comprehension score, in particular, was thought to be low in comparison to other second grade students. Her relative strengths were listening, math problems, and math computation. (R. 145.)

On February 23, 2000, a Comprehensive Evaluation Report was prepared by the Crawford County School District Special Services Department. (R. 128–32.) Although Sheriff's evaluators noted that she was "always cooperative to work with" and seemed to try hard, it appeared that her frustration level was increasing and that she was overwhelmed by her work requirements. (R. 128.) Chief among the concerns were Sheriff's limited sight word vocabulary, difficulty with comprehension, weakness in phonics, and difficulty sounding out words. (R. 129.) Standardized testing revealed average skills in auditory sequential memory, auditory discrimination, and visual memory; however, auditory memory and visual discrimination were felt to be below average. (R. 130.) Her full scale IQ, as measured by WISC III, was 73, while verbal IQ was 75 and performance IQ was 74. Her perceptual age, as measured by Bender Gestalt, was less than the 5th percentile. Results from the Wechsler Individual Achievement Test placed her basic reading skills in the 9th percentile, math reasoning in the 25th percentile, spelling in the 8th percentile, reading comprehension and numerical operations each in the 4th percentile, and listening comprehension in the 32nd percentile. A test of auditory perceptual skills placed her in the 3rd percentile for auditory perceptual quotient. (R. 130–31.) Overall functioning was felt to be within the borderline range of intellectual ability. (R. 136.) During the testing, Sheriff presented herself as cooperative and friendly. (R. 131, 136.) She displayed limited problem solving skills and tended to guess impulsively and give up easily on tasks perceived to be more difficult, but she was generally able to attend to tasks with occasional redirection. (*Id.*) Test results revealed average performance in nonverbal processing, manual dexterity, numerical reasoning, and listening comprehension. Significant weaknesses were found to be present in general knowledge, long-term retrieval, logical reasoning, verbal concept development, vocabulary, auditory memory, visual memory, visual sequencing skills, visual perception, auditory sequential memory, auditory discrimination, word attack skills, reading comprehension, spelling, and written math computation.

(R 136.) Based on this evaluation, it was recommended that Sheriff receive part-time learning support to provide remedial activities and a language arts curriculum at her instructional level. (R. 132.)

Sheriff's March 2000 Individualized Education Program (IEP) confirms her need for special education services. Her reading level was evaluated at the early first grade level, and she was struggling with fluency, word identification, and work attack skills. It was noted that Sheriff tried hard, was willing to accept help, and did not exhibit any behaviors that impeded her learning or that of others. (R. 151–52.) She had difficulty expressing her thoughts in written form, her visual and auditory sequencing skills were weak, and she had difficulty discriminating between like words. She tended to act impulsively and often needed redirection to complete tasks. Spelling skills, vocabulary, and expressive language were all felt to need further development, although her math skills were satisfactory. It was recommended that Sheriff receive a reading curriculum that would allow for significant repetition and review as well as remedial activities in visual and auditory skills. She also needed to further develop vocabulary and verbal expression skills. (R. 152.) Accordingly, Sheriff's evaluators decided that she should receive reading, language, and spelling in the learning support classroom, as well as speech and language services. (R. 155.)

Beginning in February of 2000, Plaintiff began receiving speech support services at school. (R. 111–13.) Gayle C. Chapin, Sheriff's speech language pathologist, observed in a May 23, 2000 "Speech Questionnaire" that, despite her delayed language skills in the areas of vocabulary, concept development, auditory memory and sentence structure, Sheriff exhibited no problems with oral-motor behavior, au-dibility, articulation, intelligibility, or speech-related physical abnormalities. Ms. Chapin felt that Sheriff's prognosis was good and that she should continue her therapy into the following school year. (R. 113.)

Sheriff's learning support teacher (Martha Fisher)and guidance counselor (Karen Vanco), completed a "Teacher/Counselor Questionnaire" also dated May 23, 2000. (R. 114–17.) At that time, Sheriff was spending 49 percent of her day in learning support for reading, language and spelling along with speech and language services. Sheriff's language was noted to be intelligible and easy to understand. She was reportedly very cooperative in the classroom and did not disturb other children while at her desk. She was able to follow 2 and 3 step directives with visual cues and could focus and attend to a task in small group settings. In the learning support class she was able to complete assignments within a reasonable time frame and her quality of work was felt to be satisfactory. Science and social studies tests were read to Sheriff as needed and she had obtained satisfactory grades in those subjects. In terms of her ability to relate with others, Sheriff was reportedly "very pleasant" and "cooperative" toward her teacher/counselor and played well with the students in her second grade class. She was able to actively engage in gym, recess and field trips with no restrictions on her participation, (*Id.*)

As of June 2000, Ms. Fisher reported that Sheriff did not exhibit any significant behavior problems in the classroom. (R. 162.) Ms. Fisher had observed no foul language by Sheriff or inappropriate behaviors with other students, but she had observed Sheriff to daydream often. (*Id.*) In her final report card for the 1999/2000 school year, Sheriff received Bs in math, reading, language and spelling, and satis-

factory grades in social studies, science, art, vocal music, health, library and handwriting. (R. 163–64, 208.) It was noted that Plaintiff needed to study her math facts, was weak in problem solving, and also needed to improve oral reading. However, she made good effort and showed good class participation in art. Likewise her "work habits" teacher noted that she tried hard, completed her homework and was well prepared. Her social behaviors teacher found her to be courteous and cooperative and observant of school rules. (R. 163, 208.)

On September 11, 2000 Sheriff's school counselor, Karen Vanco, completed a teacher questionnaire based on reports and information received from Sheriff's teachers. (R. 209–13.) At that time, Sheriff was just starting the third grade and was spending about 49% of her class time in learning support for language arts as well as speech and language program support. (R. 209.) The remainder of the time she was mainstreamed in math, science, social studies, art, music, library, computer, and physical education. (*Id.*) Her classroom behavior was described as "very cooperative." She did not disturb other children while at her desk and was not considered a discipline problem. (R. 210.) She was able to follow two and three step directions with visual cues and was able to focus and attend to task, particularly in a small group setting. (*Id.*) Sheriff was able to keep pace in her learning support classroom and could complete assignments in a reasonable amount of time. At the time of Ms. Vanco's report, Sheriff was also demonstrating an ability to keep pace in her regular classes. (R. 211.) The quality of her work was felt to be satisfactory and she was completing work in a reasonable amount of time. (*Id.*) In terms of her relations with others, she was viewed as "pleasant, cooperative, respectful, and polite to all of her teachers." (R.

211.) She played well with her peers and actively participated in all activities related to gym, recess, and field trips. (R. 212.) She required no special seating arrangement. (*Id.*) Ms. Vanco noted that Sheriff still displayed delayed language skills in the area of vocabulary, concept development, auditory memory and sentence structure. However, intelligibility was not a problem, as Sheriff's conversational speech was very clear. Further, her prognosis for acquisition of skills was felt to be good. (R. 213.)

B. *Records from Bethesda Community Care*

From February 21, 2000 through September 13, 2000 Sheriff received outpatient care from Bethesda Community Care. Her attending psychiatrist was Arun Sood, M.D., and she received weekly counseling from her therapist Tanya Reynolds, M.Ed. (R. 169–207.) At the time that Sheriff first began counseling, Bishoff's boyfriend Paul had just recently been released from jail for having fractured Sheriff's arm and was battling drug and alcohol addiction problems. (R. 206–07.) During Sheriff's first visit with Ms. Reynolds, Bishoff reported that her daughter had been acting out sexually, sleeping very little at night, excreting on the bedroom floor, and threatening harm both to herself and to her mother and siblings. Her behavior, according to Bishoff, fluctuated between being affectionate on one hand and acting angry and aggressive on the other hand. She was constantly "on the go," inattentive, and forgetful. At the same time, however, Bishoff admitted giving her daughter coffee to "calm her down." (*Id.*)

During her early sessions with Ms. Reynolds, Sheriff was observed to be clingy towards her mother, oppositional, attention seeking, and constantly testing limits. (R. 197–98, 202–03, 205.) Never-

theless, even at their second session on March 8, 2000, Ms. Reynolds observed Sheriff to be "workable" and "able to come around" if her negative attention seeking behavior was ignored. (R. 205.) Ms. Reynolds noted that Bishoff observed her daughter's change of behavior but was dismissive of it, stating that Sheriff would "just start up again." (R. 205.)

Treatment notes reflect that Sheriff experienced significant abuse in her early years at the hands of her natural father. (R. 202–03.) Reportedly, Sheriff's father was mentally ill and was removed from the home after trying to drown both Sheriff and her younger brother. Sheriff's father evidently engaged in acts of cruelty toward animals and would force Sheriff to participate in, e.g., killing and gutting cats. (R. 158–61, 202–03.) In addition, Sheriff had been sexually abused by an older male at the age of three, after which she began to exhibit sexually inappropriate behaviors. (R. 158–59, 195.) Her best friend Lisa had also allegedly been raped and the two girls tended to act out sexually in their play. (R. 197–98, 202–03.) Bishoff reported that her boyfriend "Paul," while rejecting their flirtations, would make comments about "waiting until Lisa grows up"; Bishoff apparently did not view this as inappropriate. (R. 202–03.) By March of 2000, Ms. Reynolds felt that she was beginning to establish a sense of trust and respect with Sheriff. (R. 203.) Though Sheriff still frequently tested limits, she was generally compliant at her sessions when her negative behavior was not rewarded with attention. (*Id.*)

On April 3, 2000, Sheriff was psychiatrically evaluated by Dr. Sood following complaints by her mother that she was acting uncontrollably, pushing people down the stairs, attempting to have sex with her younger brothers, choking her siblings and physically abusing her mother. (R. 158–61,

204.) She was very possessive of her mother and jealous of Bishoff's attentions to the other children. She frequently fought with her siblings and peers and also tried to have sex with them; consequently, she was not allowed out of the house without adult supervision. Sheriff also tended to throw temper tantrums when she did not get her way, including screaming, throwing objects and becoming assaultive toward others. She reportedly had difficulty sleeping and a poor appetite, although she was well developed and well nourished. On mental status examination, Sheriff appeared very shy and anxious and continually clung to her mother or played loudly with toys. Her affect appeared blunted. Sheriff admitted to having auditory hallucinations, which she described as voices inside her head telling her to do bad things, such as pushing her mother down the stairs or beating up her younger siblings. She reported having heard these voices since the age of three or four and claimed to hear them almost every day on a continual basis. Dr. Sood's diagnosis was:

AXIS I: 1. Psychotic Disorder Not Otherwise Specified

2. Learning Disorder Not Otherwise Specified

AXIS II: Rule out Borderline Mental Retardation

AXIS III: No Diagnosis

AXIS IV: Ann suffered from rather severe stressors in her early childhood, including physical and sexual abuse. Currently, she is moderately stressed due to the fact that she lives in a single parent family and the resources in the household appear to be limited.

AXIS V: Current GAF = 40.

(R. 160.) Sheriff was prescribed Risperdal for her psychotic behaviors and home therapy services for twenty hours each week

due to Bishoff's difficulty in handling her behavior. (R. 160–61.)

Sheriff continued with Ms. Reynolds on April 5, 2000, at which time Sheriff was observed to be doing well and cooperating with her therapist, even when limits were placed upon her behavior. (R. 199–200.) She was reportedly sleeping two hours more at night and was taking her Risperdal. Ms. Reynolds felt that she had seen a "significant shift" in Sheriff's ability to "hang in there" and allow others to help her work through her feelings. She encouraged Bishoff not to withhold emotional support for her daughter. She further recommended that Sheriff limit her time with her friend Lisa as well as some boys at school with whom she had recently had altercations. (*Id.*) At their next appointment on April 19, 2000 Ms. Reynolds again observed that, while Sheriff continually tested behavioral boundaries, she was showing constant improvement in accepting limits and following rules at her appointments. (R. 197–98.) Sheriff tended to react well when she received little negative attention and much positive attention. It was noted that Bishoff tended to attribute sexual intent to her daughter's childlike behavior, as in the case of a family friend whom Sheriff allegedly "flirted" with at the age of three. (*Id.*)

Over the next month Sheriff continued to show general improvement. Dr. Sood observed on April 25, 2000 that her affect seemed brighter. She was reportedly doing better in school according to her mother, although she remained defiant and aggressive at home. (R. 204.) At her session with Ms. Reynolds the following day, it was noted that she was making progress in terms of sitting through the sessions without her mother present. (R. 197.) At one point, she lightly slapped her mother during a small disagreement but was able to successfully talk through the problem.

(*Id.*) As of May 17, 2000, Sheriff was learning to share things, was letting her therapist decide which games to play, and was attending better to games and conversation. She was accepting limits more frequently from Ms. Reynolds without becoming defiant. (R. 194–95.)

Significantly, Ms. Reynold's treatment notes reflect a home environment in which Bishoff's boyfriend Paul had historically been physically, sexually, and emotionally abusive towards Bishoff. (R. 193–94.) Worse, he had acted in a provoking, threatening, and bullying manner toward Sheriff, who felt relieved by his departure. Sheriff admitted to her counselor that Paul's presence in the home had made her fearful of the family's safety; indeed, on one occasion when Paul had been acting abusively, Sheriff became so anxious that she jumped out the window and ran to a neighbor's house to call 911. (*Id.*) Notwithstanding these concerns, which Ms. Reynolds discussed with Bishoff on May 24, 2000 (R. 193–94), Paul was permitted to stay at the house for a few days the next week after having stalked and harassed the family. (R. 191–93.) At her May 31, 2000 appointment with Bishoff and Sheriff, Ms. Reynolds discussed the impact that this domestic violence was having on Sheriff as well as the family's options for making their own safety the top priority (such as going to a shelter). (*Id.*)

Despite these on-going problems at home, Ms. Reynolds reported a "dramatic" and positive shift in Sheriff's behavior: she was able to act more cooperatively, was less oppositional, was willing to share and take turns, and was able to express her feelings more with words. (R. 191–93.) Contrary to her behavior two months prior (R. 200–01), she was able to play a board game to completion without attempting to change the rules. Ms Reynolds felt that Sheriff was responding positively to their

flexible, yet fairly structured, sessions. When angry or upset, she could respond well to choices or prompts given to express her feelings with words. Her mother reported a decline in her outward sexual behavior, though she was still frequently "out of control" at home. (R. 191–93.)

On June 5, 2000, Dr. Sood started Sheriff on Depakote for complaints of continued "out of control" behavior at home, which had included an assault on Sheriff's younger brother. (R. 169, 186.) Several weeks later, Bishoff reported a significant improvement in Sheriff's behavior since going on Depakote: she was reportedly acting compliant with rules and being pleasant toward her siblings. (R. 186.) On examination, Dr. Sood found Sheriff to be alert, oriented, cheerful, pleasant and cooperative. (*Id.*)

Meanwhile, in therapy, Ms. Reynolds, Bishoff and Sheriff continued to address issues of domestic violence. Their June 14, 2000 session focused on why Paul was an "unsafe" person. (R. 183–84, 187–90.) Ms. Reynolds noted that Paul had stayed overnight at Bishoff's house the previous night. The following day Sheriff had reportedly demanded to accompany Paul when he left the house and Bishoff acceded. Paul then proceeded to leave Sheriff alone at an auto shop for over four hours while he went off and smoked marihuana. A stranger took Sheriff to lunch at Taco Bell. It was also noted that Paul had left the kids alone with friends on prior occasions while doing drugs and alcohol. Since getting out of jail, Paul had continued his emotion abuse of Sheriff, referring to her on occasion as a "stupid bitch," "slut", and "whore." He would engage in physically abusive and/or sexually inappropriate behavior toward Bishoff in front of the children, causing Sheriff to be fearful for her mother's safety. Sheriff was also traumatized by Paul's threats to harm himself when Bishoff attempted to end the relationship; one occasion when Bishoff was trying to get him to leave, Paul put a knife to his neck and made a hole, then left the house and cut all of the tires in Bishoff's vehicle. Sheriff was left to feel helpless and terrified by Paul's behavior, which included threats to kill the entire family. Accordingly, Ms. Reynolds discussed with Bishoff methods of empowerment such that Bishoff could assume responsibility for making safe choices for her family. Ms. Reynolds also planned to contact Children/Youth Services/ Childline. It was agreed that Bishoff would undergo counseling to address her lifelong pattern of victimization. Despite these problems, Ms. Reynolds again noted a change in Sheriff's affect overall (polite, cooperative, patient, verbal). (*Id,*)

Unfortunately, on July 21, 2000 Sheriff had an altercation with her brother in which she became angry and expressed a desire to die. (R. 186.) She ingested three Depakote pills which she threw up after her mother administered Ipecac. (*Id.*) However, the record does not reflect that Sheriff required hospitalization or received any special medication treatment as a result of this episode.

Sheriff's final counseling sessions of record focused on decreasing her fear and anxiety when discussing past instances of abuse with "safe" adults. (R. 175–76.) Progress notes dated July 27, 2000 reflect Sheriff's desire that Paul "leave them alone." Sheriff confided to Ms. Reynolds that she "doesn't like when he follows them everywhere" and she was continuing to experience nightmares due to her fears over Paul's threats to kill the family. (*Id.*) At that session, Bishoff reported that Paul had supposedly "backed off" recently, and the family was planning to move into emergency Section 8 housing in the near future. (*Id.*)

Nevertheless, Ms. Reynolds's final treatment notes of record show that Paul continued to have contact with the family thereafter. (R. 173–74.) At her August 6, 2000 appointment, Sheriff related that she was still experiencing frequent nightmares about Paul killing the family. She was upset over the fact that Paul had recently been permitted to visit some of her siblings. At her therapy session, Sheriff displayed a dysphoric mood, somewhat blunted affect, guarded motivation and difficulty focusing and attending to tasks. Ms. Reynolds noted that Bishoff had been picking Sheriff up from her appointments but not coming to the sessions. She felt that more involvement from Bishoff was needed. (*Id.*)

## C. *The Administrative Hearing*

At the administrative hearing on September 21, 2000 testimony was received from both Bishoff and Sheriff. (R. 35–65.) Sheriff, then in third grade, stated that she cannot read very well, i.e., "can read a little bit of words." (R. 41.) She indicated that she did not like school but liked playing on the slide and equipment. (R. 42.) She testified to being in a number of fights in the neighborhood during the summer with at least seven different people. She stated that she likes to fight "[b]ecause whoever fights with me I'll fight back and I'm not a chicken." (R. 42–43.) Nevertheless, she denied starting the fights, stating, "I'm a good little angel." (*Id.*) Sheriff also testified that she had been involved in two incidents with police officers during the summer, including one in which she was stopped from entering another person's home without permission. According to Sheriff, she called this officer a "whore," "bitch," "ho," and "slut." (R. 44–45.) Sheriff explained that she called the officer these names because she was "pissed off" and "anybody gets me mad they don't want to see my temper." (R. 45.) She

admitted to cutting her mother's hair during the night prior to the hearing because her mother had broken one of her CDs and she "hated" her mother. (R. 45–46.) She does not help with chores because she hates them, and she sometimes hits her siblings because "they're brats and annoying." (R. 48–49.) She admitted to hearing voices and claimed that she had heard a voice the previous night telling her not to come to the hearing. (R. 46–47.) Sheriff also testified to other incidents such as punching a girl on the school bus, throwing roller blades down the stairs at her mother, and beating up other girls at Girl Scouts. She also spoke of an incident in which she smacked her friend's brother in response to an unwanted sexual assault which occurred during a sleep over. (R. 49–52.) Finally, Sheriff admitted that she swears frequently and sees nothing wrong with that conduct. (R. 52.)

Bishoff testified at the hearing that Sheriff has engaged in such inappropriate behavior as "[h]aving oral sex with her brothers, touching them inappropriately in the front areas and playing with herself." (R. 53.) As a result of this conduct, Sheriff was not permitted to be alone with her brothers. (R. 53.) She disagreed with her daughter's account about the sleep-over incident, stating that her friend's mother had caught the girls "giving each other hickeys in their private areas." (R. 53–54.) During the summer, she was not allowed outside because of her fights with other children in the neighborhood, which allegedly occurred every day. (R. 54.) She fought with her siblings as well. (R. 54.) She described an incident where Sheriff attempted to grab onto the back of a bus to catch a ride downtown. (R. 59–60.) Bishoff stated that her daughter will throw tantrums if required to do chores around the house. (R. 59.) Further Sheriff allegedly was still claiming to hear voices, even

as recently as two nights previously. (R. 56.) In response to these voices the family had performed a "ceremony," thinking that the problem might be spiritual in nature. (R. 56–57.) At the time of the hearing, Sheriff was taking Depakote and Zyprexa, but Bishoff claimed that the Depakote was not effective. (R. 58–59.)

Bishoff also confirmed at the hearing that she was still involved with her boyfriend Paul, although he was no longer staying at the house. (R. 61.) According to Bishoff, Paul is permitted by court order to have supervised visits with his two children, although Bishoff does not allow him to take the children. (R. 62.) During the month that the court order had been in place, Paul had been acting "good," according to Bishoff, and she had not needed to call the police. (*Id.*) Nevertheless, she admitted that Paul tends to frequently yell and shout both at her and at Sheriff. (R. 62–63.) Bishoff explained that her daughter has gotten yelled at for kicking Paul in his genitals or walking in on him in the bathroom. (*Id.*)

Bishoff acknowledged that Sheriff's attendance at school was good and that it is not difficult to get her up in the morning and get her to school. (R. 63.) She was not having as much trouble with fighting in school; however, she was allegedly in danger of being suspended from the school bus in the event of one more write-up. (R. 64.) Bishoff also testified that Sheriff's teachers read everything to her at school, including tests. (R. 64.)

D. *Records from Belmont Pines Hospital*

Following the administrative hearing, Sheriff was treated at Belmont Pines Hospital from September 26 through October 5, 2000. (R. 215–68.) She was admitted at the suggestion of a crisis team after exhibiting "out of control" behavior, expressing suicidal ideations and attempting to jump out of a window. (R. 216–17, 222, 224–31.) She was once again experiencing nightmares about Paul attempting to kill her and was sleeping less than six hours each night. (R. 222, 224–31.) Upon initial psychiatric evaluation, Phillip G. Maiden, M.D. found Sheriff to be hypomanic, with increased speech and psychomotor activity, possibly attending to internal stimuli. (R. 216–17.) Her sensorium were clear and memory, attention, orientation, and concentration were all intact. Her thoughts were clear, coherent, and goal directed, but she was felt to exhibit poor insight and judgment. She admitted to recent auditory hallucination, but showed no evidence of delusion. (*Id.*) It was thought at that time that she was capable of harming herself or others. (R. 267.) She was started on Concerta and her Zyprexa and Depakote levels were increased. (R. 261.) The following day Dr. Maiden observed that Sheriff's mood was more stable. (R. 262.) She was not yet responding to her medications but was tolerating them well. She showed a poor sense of interpersonal boundaries, but was showing improvement. (*Id.*) Over the next week, her mood continued to stabilize, her affect brightened, and her behavior became more controlled. (R. 259, 260, 262.)

On October 5, 2000, Dr. Maiden felt that Sheriff had received the maximum potential benefit from her hospitalization and had achieved her discharge goals. (R. 260.) Her mood was euthymic and much improved, sensorium were clear, and affect was appropriate. There was no evidence of thought disorder or suicidal/homicidal ideation at that time. (*Id.*) His final diagnosis upon discharge was:

AXIS I: Bipolar II disorder, Attention Deficit/ Hyperactivity Disorder;

AXIS III: no general medical condition

AXIS IV: problems with primary support group, problems related to social environment;

AXIS V: Admission GAF 20, Current GAF 40.

(R. 215.) It was recommended that Sheriff follow up with Dr. Sood for monitoring of her medications and continue counseling with Ms. Reynolds. (R. 253.)

### E. *State Agency Psychologist*

Finally, the record contains a childhood disability form completed by Sharon Becker Tarter, Ph.D, a state agency psychologist. Having reviewed the evidence of record, Dr. Tarter opined in June of 2000 that Plaintiff had a severe impairment which did not meet, medically equal, or functionally equal the severity of any impairment listed by the Commissioner as presumptively disabling. (R. 165–68.). Dr. Tarter felt that Sheriff was markedly limited in terms of her cognitive/communicative functioning, and less than markedly limited in terms of her social functioning. (R. 167.) With respect to her motor functioning, personal functioning, and ability to maintain concentration, persistence and pace, Dr. Tarter found no evidence of any limitations. (*Id.*)

### II. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's final decision is supported by substantial evidence; if it is, the decision must be affirmed. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir.1986). Substantial evidence "does not mean a large or considerable amount of evidence," but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564–65,

108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *Perales,* 402 U.S. at 401, 91 S.Ct. 1420. It has been defined as less than a preponderance of evidence but more than a mere scintilla. *Perales,* 402 U.S. at 401, 91 S.Ct. 1420; *Jesurum v. Secretary of the United States Dept. of Health and Human Services,* 48 F.3d 114, 117 (3d Cir.1995). To satisfy this standard, "the evidence must be sufficient to support the conclusion of a reasonable person after considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding." *Monsour,* 806 F.2d at 1190.

### III. DISCUSSION

### A. *Standards for Establishing "Disability"*

For a child under the age of eighteen to be considered "disabled," and thus eligible for SSI benefits, the individual must demonstrate "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). An impairment causes "marked and severe" functional limitations if it meets or is medically equal in severity to an impairment listed in the Commissioner's regulations as presumptively disabling, *see* 20 C.F.R. Part 404, Subpt. P, Appendix 1 ("Listing of Impairments"), or if it is the functional equivalent of a Listed Impairment. *See* 20 C.F.R. § 416.924(d) (2001).

The Commissioner uses a three-step evaluation process to determine whether a child is eligible for SSI under the foregoing standards. The Administrative Law Judge ("ALJ") must determine: (1) wheth-

er the child is engaging in substantial gainful activity; (2) whether the child's impairment is severe; and (3) whether the impairment meets, medically equals, or functionally equals in severity any Listed Impairment. 20 C.F.R. § 416.924(a)-(d).[1] If the child has engaged in substantial gainful activity, the child will be found "not disabled." *Id.* at § 416.924(b). Further, if the child has an impairment(s) that is not "severe"—i.e., it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations—the child will be found "not disabled." *Id.* at § 416.924(c). However, if the child has not engaged in substantial gainful activity, he/she has a severe impairment(s) which meets the statutory duration requirement, and the impairment(s) meets, equals, or is the functional equivalent of a Listed Impairment(s), the child will be found disabled. *Id.* at § 416.924(d).

In order for a child's impairment to be considered functionally equivalent to a Listed Impairment, a child claimant under the age of eighteen must demonstrate that her impairment results in "marked" limitations[2] in two domains of functioning or an "extreme" limitation[3] in one domain. 20 C.F.R. § 416.926a(a) (2001). The relevant domains are: (i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being. *Id.* at § 416.924a(b)(1). Of specific relevance to this case are the domains of "acquiring and using information," "attending and completing tasks," "interacting and relating with others," and "caring for yourself."

The domain of "acquiring and using information" refers to how well the child acquires or learns information and how well she uses the information that she has learned. 20 C.F.R. § 416.926a(g) (2001). School aged children (ages 6 to attainment of age 12) should be able to learn to read, write, do math, and discuss history and science. *Id.* at § 416.926a(g)(2)(iv). They "will need to use these skills in academic

---

**1.** All citations to the regulations herein refer to the version in effect at the time of the ALJ's decision. The Social Security Administration revised these regulations on September 11, 2000, effective January 2, 2001. *See generally* Social Security Administration Regulations, 65 Fed.Reg. 54747 (Sept. 11, 2000).

**2.** In this context, the term "marked" limitation is defined as follows:

[Y]ou have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least

two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i) (2001).

**3.** "Extreme" limitations exist:

when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i) (2001).

situations to demonstrate what [they] have learned"; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions." *Id.* School-age children "will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). *Id.* They are expected to be able to use increasingly complex language to share information and ideas with others by asking questions and expressing their own ideas and by understanding and responding to the opinions of others. *Id.*

"Attending and completing tasks" refers to how well a child is able to focus and maintain attention and how well he/she can begin, carry through, and finish activities. It considers the pace at which a child performs activities and the ease with which he/she change them. *See* § 416.926a(h). The Commissioner considers that school-aged children should be able to focus attention enough to follow directions, remember and organize school materials, and complete classroom and homework assignments. *Id.* at § 416.926a(h)(2)(iv). They should have sufficient concentration to avoid careless mistakes, competently change activities or routines without distraction, and be able stay on task and in place. *Id.* They should be able to participate in group sports, read alone, complete family chores, and engage in transition tasks (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation. *Id.*

The domain of "interacting and relating with others" is concerned with "how·well you [the child claimant] initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules,

respond to criticism, and respect and take care of the possessions of others." § 416.926a(i). School-age children should be able to develop more lasting friendships with their peers, understand how to work in groups to create projects and solve problems, demonstrate an increasing ability to understand another's point of view and to tolerate differences, and be well able to talk to people of all ages to share ideas and stories and to speak in a manner that both familiar and unfamiliar listeners readily understand. *Id.* at § 416.926a(i)(2)(iv).

Finally, the domain of "caring for yourself" addresses how well a child can maintain a healthy emotional and physical state, including how well he/she gets his physical and emotional wants and needs met in appropriate ways, how the child copes with stress and environmental changes, and whether the child can take care of his/her own health, possessions, and living area. *See* § 416.926a(k). For school-age children, this means being independent in most daily activities such as dressing and bathing oneself, though reminding may sometimes be necessary. It means recognizing one's own competence or difficulties with particular activities, identifying circumstances when one feels good or bad about oneself, developing an understanding of what is right and wrong and what is acceptable or unacceptable behavior. *Id.* at § 416.926a(k)(2)(iv). It involves developing consistent control over one's own behavior, avoiding those that are unsafe, etc., and imitating more of the behaviors of familiar adults. *Id.*

As noted above, the "functional equivalence" of a Listed Impairment is established by showing that a child has marked limitations in at least two of the six domains, or an extreme limitation in at least one domain. § 416.926a(d). As with any disabling impairment, the statutory dura-

tion requirement must be met. *See* 20 C.F.R. §§ 416.909, 416.924(a), 416.926a(m) (2001). Furthermore, the child's functional limitations must result from his/her medically determinable impairment(s). *Id.* at § 416.926a(g)(3), (h)(3), (i)(3), (j)(3), (k)(3), (*l*)(4).

B. *The ALJ's Findings Concerning Disability*

In this case, the ALJ found at steps 1 and 2 of the analytical process that Sheriff had never engaged in any substantial gainful activity and that she has "severe" impairments, *to wit:* borderline intelligence, psychotic disorder, NOS, bipolar II disorder and attention deficit/hyperactivity disorder. (R. 27.) At step 3 the ALJ determined that Sheriff's severe impairments did not meet the criteria of any Listed Impairment and were not the medical or functional equivalent of any such impairment. (*Id.*) Accordingly, the ALJ determined that Sheriff was not under a "disability" at any time through the date of her decision (March 26, 2001). (*Id.*)

On appeal, Sheriff basically argues that the ALJ's decision is not supported by substantial evidence insofar as the ALJ determined that Sheriff was not "disabled." She raises a number of specific objections to the ALJ's findings at step 3 of the analysis, which we will address seriatim.

*(i) Listing 112.05D—Mental Retardation*

■ Sheriff's first argument is that she is "disabled" because she meets the criteria of Listing 112.05D pertaining to mental retardation. The requirements of Subsection D are met if the claimant has a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function." Appen-

dix 1, § 112.05D. The ALJ found that Sheriff did not meet the foregoing criteria because her WISC–III scores as of February 8, 2000 (verbal IQ—75, performance IQ—74, full scale IQ—73) all exceeded 70 and because Sheriff's borderline intellectual functioning had shown improvement with special education classes and treatment. Sheriff contends, however, that she satisfied the listing because of the fact that IQ scores are thought to have an error of measurement of approximately 5 points. (Pl.'s Br. at 14, citing *DSM* at 39.) Relying on *Halsted v. Shalala*, 862 F.Supp. 86, 90 (W.D.Pa.1994), Sheriff contends that all of her IQ scores were within the criteria of Listing 112.05D when applying a "minus 5 point" deviation. *See id.* (holding that an IQ score of 74 is within the criteria of Listing 12.05, pertaining to mental retardation in adults, based on a five point margin or error). Sheriff also contends that her Bipolar Disorder, ADHD, and Psychotic Disorder singly or in combination impose additional and significant limitations of function as required by the listing.

The Court is not persuaded by Sheriff's arguments. Clearly, the listing requires *both* an IQ of 60–70 *and* a physical or other mental impairment imposing an additional and significant limitation of function. The ALJ correctly concluded that Sheriff's IQ scores above 70 rendered the listing inapplicable. It is true that the *Diagnostic and Statistical Manual of Mental Disorders (DSM)* (4th ed.1994) acknowledges the 5–point margin of error in IQ assessments and further acknowledges that "it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." *Id.* at 39–40. However, as the government points out, Sheriff has never been diagnosed with mental retardation and such a diagnosis

would seem inappropriate in light of her satisfactory scholastic performance, the fact that she is mainstreamed in the majority of classes, and the fact that she has never been demoted or held back. To the extent that *Halsted* supports a "per se" five-point downward adjustment in IQ scores, we decline to apply the rule of that case. We note that the administrative regulations require only that the ALJ accept the lowest of the verbal, performance and full-scale IQ scores when evaluation Listing 112.05; they make no mention of a mandatory five-point adjustment in favor of the claimant. *See* 20 C.F.R. pt. 404, Subpt. P, Listing 112.00, "Documentation" at D(9). (2001). Moreover, *Halsted* is factually inapposite because, in that case, the claimant had been explicitly diagnosed as mentally retarded despite her IQ scores above 70, *see id.*, 862 F.Supp. at 89–90, whereas no such diagnosis has been made here. In sum, since none of Sheriff's IQ scores are within the range required by Listing 112.05D, she fails to satisfy this necessary criterion, and the ALJ was therefore justified in determining that the listing was not met.

### (ii) Listings 112.02, 112.04 and 112.11

We next consider the ALJ's determination that Sheriff failed to meet the criteria for Listings 112.02 (pertaining to organic mental disorders), 112.04 (pertaining to mood disorders), and 112.11 (pertaining to Attention Deficit Hyperactivity Disorder). Each of these listings contains an "A" category—requiring the presence and/or persistence of certain medically documented findings—and a "B" category, requiring (for children ages 3 to 18) that the relevant medical findings result in at least two of the following:

a) Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests ...

b) Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c) Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d) Marked difficulties in maintaining concentration, persistence, or pace.

(*See* Appendix 1, §§ 112.02, 112.04, 112.11 (2001).) The term "marked" limitation in this context means "more than moderate but less than extreme." *See* Appendix 1, § 112.00(C) "Assessment of Severity" (2001). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." *Id.* Moreover, when standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction. *Id.* Both the requirements of the "A"

category as well as those of the "B" category must be met in order for any of these listings to be satisfied.

In the instant case, the ALJ found that Sheriff satisfied the "A" criteria for Listings 112.02, 112.04, and 112.11. However, the ALJ found that Sheriff failed to meet the "B" criteria for each of these listings because, in all of the enumerated categories, she had limitations that were less than "marked." Sheriff takes issue with this latter conclusion, arguing that the record compels a finding of "marked" limitations in *all* of the relevant categories. We will address each of these findings, though not in the order considered by the ALJ.

■ Turning first to the issue of personal functioning, we find no error in the ALJ's determination that Sheriff's limitations were less than marked. The area of "personal functioning," as set forth in the § 112.00 mental disorders, refers to self-care issues such as feeding, dressing, toileting, bathing, maintaining personal hygiene, proper nutrition, sleep, health habits, adhering to medication or therapy regimens, and following safety precautions. *See* Appendix 1, § 112.00(C)(2)(c) and (3). Development is measured in terms of the child's increasing ability to help herself and to cooperate with others in taking care of these needs, while impaired ability in this area is manifested by failure to develop or use such skills, or self-injurious actions. *Id.*

In this case, the ALJ noted that Plaintiff is able to get up in the morning, can get ready for school, and has good attendance, notwithstanding Bishoff's assertion that her daughter complains when having to put on her own clothes. (R. 63, 108, 125.) The record does not evidence any significant on-going problems with respect to

Sheriff's feeding or nutrition, toileting, bathing, hygiene, or ability to take her prescribed medications. The ALJ acknowledged Sheriff's recent suicidal ideations, leading to a brief hospitalization and diagnosis of bipolar disorder; however, the ALJ accurately observed, per the treatment notes, that Sheriff's symptoms were adequately resolved with proper medication and counseling. It is true that Plaintiff also reportedly took Depakote on one prior occasion in an apparent attempt to harm herself. However, the record fails to indicate any hospitalization or other intense treatment following this episode, and this does not appear to have been a recurrent problem. In fact, there is some evidence that around the time of this incident, Bishoff canceled her daughter's home therapy sessions contrary to medical advice because she did not think them necessary. (R. 171–72.) The record does reveal that Sheriff had difficulty at times sleeping at night. However, the record also reflects that during this period Bishoff was allowing her daughter to drink coffee to "calm her down." (R. 202–03, 206–07.) In addition, Sheriff was experiencing nightmares stemming from the abusive tendencies of Bishoff's boyfriend. Sheriff's sleeping problem seemed to improve, however, with treatment and counseling which focused on allaying Sheriff's anxieties. Overall, the record does not reveal any persistent, marked limitation in the area of personal functioning.[4] Accordingly, the ALJ's factual determination was properly supported by substantial evidence.

■ Next, with respect to the area of concentration, persistence, or pace, the Court finds that the record adequately supports the ALJ's determination that Plaintiff shows a less than marked limitation. The intent of these particular func-

---

4. Plaintiff's overt sexual behavior is more appropriately categorized under the rubric of social functioning as has been discussed in that section.

tional criteria "is to identify the child who cannot adequately function in primary school because of a mental impairment." Appendix 1, § 112.00(C)(3) (2001). The record reflects that Plaintiff is generally performing satisfactorily at school and is mainstreamed in most of her classes. The February 8, 2000 evaluation performed by school psychologist Patti Davison indicates that Sheriff has adequate attending skills, though redirection was sometimes required. The ALJ acknowledged that some attention problems were noted in the February 2000 Comprehensive Evaluation Report from the Crawford Central School District. However treatment notes from Tammy Reynolds indicate that Plaintiff's concentration skills improved with therapy to the point that she could play a board game to completion without attempting to change the rules. Plaintiff's school records show that Sheriff can follow 2 and 3 step directions with visual cues and can focus and attend to tasks, particularly in a small group setting. She is able to keep pace with her work and can satisfactorily complete her assignments within a reasonable amount of time. Although Plaintiff was diagnosed with ADHD, progress notes from Belmont Pines show that she responded well to treatment and, by the end of her stay, was responding positively to redirection. The ALJ also noted that, despite Bishoff's claims as to Sheriff's lack of attentiveness, Sheriff could watch television for hours at a time. (R. 110.) Finally, the ALJ recounted her own observation that, when directed to sit still and be quiet at the hearing, Sheriff was able to comply. This evidence collectively supports the ALJ's conclusion that Sheriff's limitations in concentration, persistence and pace were less than marked. While it is true that Plaintiff has been placed in certain special education classes, performs better in a small group setting, and sometimes needs tests read to her, these factors do not appreciably undermine the ALJ's assessment. Accordingly, the ALJ's finding will not be disturbed.

■ We next consider the area of social functioning. As all parties seem to acknowledge, there is no question but that Sheriff has experienced significant trauma in her short life and significant difficulties in her social relationships. The ALJ acknowledged Sheriff's history of sexually inappropriate behavior, which includes attempts to have sex with her own siblings, as well as her difficulties on the school bus, at home, and in the neighborhood. Specifically, Plaintiff has been reprimanded for bad behavior at home and on the bus, she fights with neighborhood children, she refuses to do chores around the house, and she hits her siblings whom she considers annoying brats. She was referred for outpatient treatment at Bethesda Community Care for grossly sexually inappropriate behaviors, physical aggression, anxiety and insomnia. At that time Sheriff was allegedly hearing auditory hallucinations, though she could not provided any significant information about them to Dr. Sood.

However, notwithstanding these problems, we conclude that there is substantial evidence in the record to support the ALJ's finding that Sheriff's social functioning—though certainly limited—was less than markedly limited as the result of her mental impairments. There is an unmistakable pattern in the record, fortunately, of Sheriff's progressive improvement in response to medication and therapy. Ms. Reynolds's treatment notes reflect repeated observations of a significant positive change in Sheriff's behavior with continued therapy. During the course of her weekly counseling sessions, Sheriff was progressively able to act in a more cooperative manner, was less oppositional, responded better to limits and rules, improved at taking turns and shar-

ing, became more willing to allow others to help her, and was better able to cope with her feelings through appropriate verbal expression. In June of 2000 Bishoff reported a significant improvement in Sheriff's behavior since going on Depakote, as she had been more compliant with rules at home and more pleasant toward her siblings. Although Sheriff was admitted to Belmont Pines in late September of 2000 for extreme behavior and suicidal ideations, her symptoms were adequately controlled by the time of her discharge and there was no evidence of thought disorder at that time. To the contrary, her mood was much improved, her sensorium clear, and her affect appropriate.

In sum, while there is no question that Plaintiff has experienced significant behavioral problems in the area of social functioning, which this Court in no way minimizes, we conclude that the ALJ was justified in finding that Sheriff's underlying mental disorders, and any resulting social limitations, were adequately controlled with treatment, including medication and on-going therapy. The record amply supports this conclusion. Further, we believe the record also substantially supports the ALJ's finding that Plaintiff's problems were attributable primarily to poor parenting decisions as opposed to any underlying mental impairment. The progress notes of Tammy Reynolds are particularly insightful and explicitly describe—as the ALJ phrased it—"the difficulties that [Sheriff] has been facing at home due to her mother's abusive boyfriend and the claimant's own uncertainty regarding 'how to react to her mom.'" (R. 19; *see also* R. 181–82.) The ALJ specifically cited Ms. Reynolds's concerns about Bishoff's poor decision making in allowing Sheriff's tantrums to manipulate her and allowing her abusive boyfriend's behavior to sway her mothering deci-

sions. (R. 19; *see also* R. 183–84, 187–90.) Ms. Reynolds's progress notes reflect tendencies on Bishoff's part to be dismissive of her daughter's improvements and/or to withhold emotional support, to attribute sexual intent even to certain childlike behaviors, and to make unsafe choices for her family as a result of her own pattern of victimization. (R. 197–98, 199–200, 205, 183–84, 187–90.) As the ALJ fairly observed, the treatment notes from Bethesda Community Care generally do not reflect treatment of a person with a psychotic disorder but are more focused on Plaintiff's attempts to deal with her chaotic home life. The fact that Plaintiff can function adequately outside of her destructive home environment is demonstrated by the fact that Plaintiff's teachers and school counselors have consistently found Sheriff to be pleasant, cooperative, respectful and polite to her teachers, and able to play well with her peers. She has been able to fully participate in field trips, gym class, and recess and requires no special seating arrangement. In sum, we think there is ample evidence in the record supportive of the ALJ's conclusion that Sheriff's behavior is "less the product of mental illness and more the product of bad parenting." (R. 19.)

Plaintiff concedes in her brief that "it is reasonable to take a position that bad parenting has played a role in the Plaintiff's difficulties with social functioning (as evidence in part by the fact that the Plaintiff has had little difficulty in the area of social functioning while at school but has had severe problems at home)." (Pl.'s Br. at 16–17.) Nevertheless, she argues that "the fact that the mother may be contributing to the problem does not negate the fact that the Plaintiff has engaged in very serious, inappropriate behavior, which has included constant fighting in the neighbor-

hood, little respect for peers or adults, violent behavior towards family members, and sexually inappropriate comments and behavior with peers, family members and adults." (*Id.* at 17.) However, the Commissioner's regulations are clear that "[t]he functional restrictions in paragraph B *must be the result of the mental disorder* which is manifested by the medical findings in paragraph A." *See* Appendix 1, § 112.00(A) ("Introduction") (2001) (emphasis supplied). The ALJ found that when appropriately controlled with medication, therapy and treatment, Plaintiff's mental disorders do not result in a marked limitation of social functioning. Overall, the ALJ found, the case was more reflective of poor parenting than any disabling mental impairments. Whether or not this proposition would withstand review under a *de novo* standard of review is of no moment. The fact remains that the record here *substantially* supports the conclusion that Sheriff's underlying mental impairments are capable of being adequately controlled with medication, therapy and treatment, and do not in themselves result in marked limitations in social functioning.

■ Turning finally to the area of cognitive/communicative functioning, the ALJ found a less than "marked" limitation based on several factors. Sheriff's psychological evaluation of February 8, 2000 included administration of the WISC–III, which in turn yielded IQ scores of 75 (verbal), 74 (performance) and 73 (full scale), indicating borderline intelligence. The ALJ accurately observed that a "primary criterion" for limited cognitive function is a valid verbal, performance, or full scale IQ of 70 or less. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00(C)(2)(a) and (3) (2001). This psychological evaluation further revealed that Sheriff had limited sight word vocabulary, exhibited difficulty with comprehension, was weak in

phonics, and had trouble sounding out words; however, she seemed to learn well auditorily and could work hard and apply herself when she wanted to. Though Sheriff requires special education classes in reading, spelling and speech, she has done well in these courses, obtaining a final grade of "B" in her second grade reading, language and spelling courses. She is mainstreamed and has performed satisfactorily in all of her other courses. The ALJ noted that Dr. Sood found Sheriff's speech "immature" during his initial psychiatric evaluation on April 3, 2000; however, Sheriff's school counsel reported that her language is intelligible and easily understood. The counselor further opined as of September 11, 2000 that Sheriff's prognosis for acquisition of skills is good. Though Bishoff testified that her daughter needs to have all of her tests read to her at school, in fact Sheriff's learning support teacher confirmed that only her science and social studies tests are read and only on an "as needed" basis. Plaintiff's language and speech pathologist reported on May 23, 2000 that Sheriff has delayed language skills in vocabulary, concept development, auditory memory and sentence structure; however, she was thought to be adequate for intelligible speech and was given a good prognosis. We conclude that a reasonable mind could well accept the evidence relied upon by the ALJ as adequate to support the conclusion that Plaintiff's limitations in the area of cognitive/communicative development are less than marked.

■ Plaintiff objects that the ALJ failed to discuss her results on the Iowa Tests of Basic Skills, which yielded a core total score in the sixth percentile and a reading score in the first percentile. Even taking this evidence into account, however, we think the ALJ's finding would be adequately supported by substantial evidence.

*See Monsour Med. Ctr.*, 806 F.2d at 1190 (To satisfy the "substantial evidence" standard, "the evidence must be sufficient to support the conclusion of a reasonable person after considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding.") (citation omitted). Nevertheless, Plaintiff maintains that the ALJ's failure to expressly discuss the Iowa Tests constitutes a violation of her duties under *Burnett v. Commissioner of Social Security Adm.*, 220 F.3d 112, 121–22 (3d Cir.2000) (requiring ALJ who is denying a disability claim to adequately discuss and refute all evidence supporting a contrary conclusion). Assuming *arguendo* that Plaintiff is correct, we consider the ALJ's alleged error to be harmless in light of our disposition of the remainder of Plaintiff's claims. Specifically, we see no purpose in remanding this matter to the ALJ for further consideration of the cited evidence because it could not make any difference to the outcome of this case. Since Plaintiff needs to establish at least two areas of marked limitation in order to satisfy the "B" criteria of Listings 112.02, 112.04, or 112.11, she would not be entitled to a finding of "disability" on this record even if the ALJ were to reconsider the evidence and determine that she had a marked limitation in cognitive/communicative functioning. Accordingly, the ALJ's finding will not be disturbed and no remand will be ordered.

### (iii) Functional Equivalence

█ We next turn to the issue whether Sheriff's impairments were functionally equivalent to a Listed Impairment. In this case, the ALJ analyzed each of the foregoing domains and determined that Sheriff had no limitations in the domains of "moving about and manipulating objects" and "health and physical well-being." Plaintiff does not challenge these findings on appeal.

As to the remaining "disputed" domains—"acquiring and using information," "attending and completing tasks," "interacting and relating with others," "caring for yourself"—the ALJ found that Sheriff's functional limitations were less than marked in each of these areas. Sheriff takes issue with these findings, arguing that she has "marked" limitations in each of these four disputed domains. She essentially incorporates each of her arguments raised in relation to the "B" criteria of Listings 112.02, 112.04, and 112.11 and relies on the same evidence previously discussed in urging that the record compels a finding of marked limitations. Because the domains at issue largely mirror those previously discussed relative to the "B" criteria of Listings 112.02, 112.04, and 112.11, we need not discuss these in detail. For all of the reasons previously set forth, as well as those articulated by the ALJ in her thorough opinion, the Court finds that there was ample evidence in this record to substantially support the ALJ's findings that Sheriff has less than marked limitations in domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself.

### (iv) Credibility Assessment

█ Plaintiff's final objection concerns the ALJ's finding that the testimony of Plaintiff and her mother were not fully credible:

> ... [I]n this case, given their behavior at the hearing, I find that the testimony of both the claimant and her mother is not credible insofar as alleging that the claimant is totally disabled. At the hearing, the claimant testified first, and her mother was constantly interrupting, elaborating on the claimant's answers. I instructed the mother to stop interfering with my questioning, and she com-

plied. However, she persisted in dramatizing the hearing by laughing at her daughter's answers, and the daughter's conduct of arguing with her attorney. Overall, the claimant was disruptive and disrespectful to both the undersigned and her attorney during the hearing. When Ms. Bishoff began to testify, the claimant continued her conduct, interrupting her mother, telling her mother to be quiet and generally disrupting what her mother said. After a few minutes I told the child to cease her outbursts and conduct, otherwise I would make her leave the hearing room. With this, the child made a face, but remained quiet and sat quietly in her chair until the hearing ended. (Prior to this, she was moving about a great deal). This demonstrates that the child can do what she is told given clear and convincing directions. Overall, this case is demonstrative of bad parenting, and the conduct of the young claimant *and her mother* was so extreme and outside the bounds of acceptability such that I believe that the claimant and her mother connived together to show disability at the hearing through the daughter's "organized" disruptive behavior.

(R. 21–22(emphasis in the original)). Plaintiff contends that there is no evidence that Bishoff and Sheriff actually "connived testimony" to reflect disability. Further, Plaintiff contends that, even if the testimony of Bishoff and Sheriff are not discounted, it is uncontroverted that Plaintiff has been diagnosed with severe mental impairments, requires learning support, has received intensive treatment both on an outpatient and in-patient basis. Plaintiff urges that, "[a]gain, while bad parenting may contribute to the Plaintiff's difficulties, the facts are that she has severe mental health impairments which have caused great difficulties in her life." (Pl.'s Br. at 18–19.)

▮ ·This Court is not persuaded that the ALJ committed any error in her credibility determination. First, as is obvious from the cited passage, the ALJ's conclusion that there was "connived testimony" derives primarily from her own first-hand observations of the claimant and her mother at the administrative hearing. This Court is not in a position to second-guess the ALJ's first-hand observations, which are well documented in her opinion. *See Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir.2000) (An ALJ may consider his own observations of the claimant and the court cannot second-guess the ALJ's credibility judgments, although they alone do not carry the day and cannot override the medical opinion of a treating physician that is supported by the record). Furthermore, while the ALJ's own personal observations cannot override undisputed medical evidence, *see id.*, it does not appear that the ALJ's credibility assessment in this case was a material factor driving her decision, except to the extent it *reinforced* her conclusion that Sheriff's behavior was attributable more to bad parenting than mental illness. To the contrary, the ALJ's finding of "no disability" was based primarily on her assessment of the medical evidence, therapy treatment notes, school records, and test scores. To the extent that those documents reflect Bishoff's subjective description of her daughter's functional problems, it appears they were substantially, if not completely, accepted by the ALJ. We therefore see no reason to disturb the ALJ's credibility assessment. Finally, we reiterate the axiomatic principle that, in order to establish disability based on functional limitations, the claimant's limitations must be caused by the underlying mental disorder. *See* 20 C.F.R. § 416.926a(g)(3), (h)(3), (i)(3), (j)(3), (k)(3), (*l*)(4) (2001); Appendix 1, § 112.00(A) (2001). The ALJ in this case found that Sheriff's serious men-

tal impairments, when properly controlled by medication, therapy and other treatment, did not result in limitations that were of a "marked" or "extreme" nature. For the reasons previously discussed, we consider the ALJ's findings to be well supported by the record.

### IV. CONCLUSION

Based upon the foregoing reasons, the Plaintiff's motion for summary judgment will be denied and the Commissioner's motion will be granted. An appropriate order follows.

### ORDER

AND NOW, this 6th day of December, 2002, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED THAT Plaintiff's Motion [Doc. No. 6] for Summary Judgment is DENIED and Defendant's Motion [Doc. No. 9] for Summary Judgment is GRANTED.

JUDGMENT is hereby entered in favor of Defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff Ann Marie Sheriff.